Good morning, Your Honors. My name is Lisa Cantor, and I'm honored to be here this morning representing the appellants Jennifer Lukas and her mother, Joyce Waters. Ms. Waters is in the courtroom today. I'm going to try to reserve a minute for rebuttal. This is an ERISA case in which a plan administrator with a structural conflict abused its discretion when it refused to pay for life-saving residential treatment for 17-year-old Jennifer Lukas when she was suffering with an eating disorder, post-traumatic stress caused by childhood sexual abuse, and multiple rapes, and substance abuse. The treatment at issue followed seven months of intensive outpatient treatment, three attempts at residential treatment, two attempts at detoxification. Could I interrupt you? Yes, sure. I think we're all very familiar with the facts of the case. I want to ask you one very preliminary question, and that is, you seem to concede, both sides agree, that the standard of review here is abuse of discretion. And it appears that you agree to that because the summary plan description says that there's discretion. But the Amara case of the Supreme Court clearly says we cannot rely just on the summary plan description unless it's part of the policy or the plan. And so I guess the issue may not be before us, but I'm wondering if you could just tell us about that a little bit, because it may become relevant down the road. Well, we only have the summary plan description here. And Beatty and Glenn tells us that unless we have a gross procedural violation, we sort of are stuck with abuse of discretion, although we can limit it so much that we're almost at de novo. Does that answer your question? But the question is whether we have the plan in the record. We don't. And we were never given the plan. So we don't know what the plan says. So we were always stuck with the abuse of discretion language. So just to be clear, you don't know whether the plan itself reserves discretion. You only know that the summary plan description does? Correct. And you've accepted that? Well, we've accepted that, Your Honor, because the regulations say that the summary plan description is the document that's supposed to be given to the participants. And as an ERISA practitioner, we're almost always stuck with that, because that's the document that we get. And if there's a conflict ---- The point is whatever might be true in the cosmic world, both sides have just agreed that this is an abuse of discretion standard for this case. Is that right? That's right. However, what I wanted to pitch to you today was that ---- It doesn't mean that they get all the discretion in the world. The point is the threshold question. We're in the abuse of discretion land, and now we're going to decide how we use it. Is that the point? Correct. Correct. But what I wanted to pitch to you today is that even when we're in this abuse of discretion land, which is this confusing, we have to take all these procedural violations and consider them all. In this case, we have a fact that I think should take us to the place where we say this is always an abuse of discretion. And here's the rule I'm advocating for, that it's always an abuse of discretion when an ERISA fiduciary relies on the medical opinion of an expert whose identification the ERISA fiduciary doesn't know and who, therefore, the ERISA fiduciary can't reveal to the planned participant. And that's exactly what happens here. Well, suppose they rely upon an organization that they have a long-term relationship to, and they know that this organization uses nothing but the finest people in the world to make their determinations, and that's what they rely upon. Why is that, per se, an abuse of discretion? I would submit to you, Your Honor, that that's not good enough, because the regulations say that the claim administrator shall consult with a health professional with sufficient qualifications to review the claim. Well, she had the qualifications, but she didn't have the name, so she couldn't check. I mean, this person could have been a complete imposter because she couldn't check it. Right. But she had to have qualifications. We had some qualifications. Have you ever seen this before? Do we have any reason to know why this is happening? Well, I am now seeing this in the mental health arena, and that is why it's so troubling to me, because this was an administrator who was handling the mental health claims. And we're seeing this diversity between what the claim administrator is doing, the ERISA fiduciary, and this complete abdication of responsibility. And what happened here was, of course, the information is not given during the claim process. We get to the Rule 26 disclosures. We're not given the identification. We send discovery. We're told by UBH, we don't know. But one problem here is that I gather that the district court was willing to have you get that name. That's right, Your Honor. But by the time we get to trial, it's too late. I mean, what other arena do you get to trial not knowing the expert witness on the other side, and yet the district court is willing to say to you, okay, now tell them what the expert witness's qualifications are, and now you can go out and take the deposition. When the regulations actually say that information is supposed to be given to you during the claim process. Glenn informs us that the obligations of the ERISA fiduciary are supposed to be, they're supposed to act solely in the interest of the plan participants. Do we know whether the outside expert knew, did he have all the case notes? No. We know he had case notes. I don't know what he had. Do we know? I mean, there's nothing in his report that indicates that he knew that she had a long and indicates that he knew that she had been through several different treatment procedures. In fact, he got some things wrong. He said he had just, she had just come for residential treatment, which wasn't right. He spelled bulimia wrong. You know, we don't know what experience he had treating eating disorders. Let me ask you a question, sort of off a little bit, maybe. What's interesting in this case, or part of what's interesting is, when they get the case notes, it apparently, the cover letter from the lady from Altamira says, well, she had to be carefully watched and we had to monitor what she ate and we had to be with her for three hours afterwards, et cetera, et cetera, et cetera, et cetera. Okay. I gather that when the notes that they were given from Altamira, it didn't cover those things, though. It only covered what went on in group. Now, maybe there's no answer to this question, but I guess one could, why not? Why wouldn't one submit the notes that back up the fact that indeed she was watched 24 hours a day? It's not a bit surprising that this lady got much better when she was getting the kind of care that they say she was getting in this hospital. And one does feel a little bit strange saying, well, she got so much better, it must be she can't get any money because she was just too good. But the problem is that one block. Why in the world, maybe it wasn't asked for, why weren't they given that? There is a disconnect between the letter from Dr. Green and the actual records. And I can't really answer the question other than to say this is a facility perhaps that's not used to dealing with insurance. But here's my problem. Excuse me? Well, this is the problem. They were never asked for more information. And in fact, the medical director said in his final notes, you know, I think she might actually qualify for residential treatment, but I don't have enough information. But the letter from Dr. Green did say that she was being monitored on a... Yes. And but the letter that was written, one of the letters denying the benefits said that she wasn't getting such treatment and that was wrong. Well, the first denial letter... The first denial letter I know said something, well, the first oral denial was on a completely different basis. But then after a while, the next one seemed to say that she wasn't really getting any disorder treatment. They weren't really monitoring her. No, the first denial letter just said she didn't meet criteria with no explanation of how she didn't meet criteria. And the last denial letter said she didn't meet criteria again, but maybe she did, but we don't have enough information, which is a classic... But one of the statements from maybe it was the internal notes said something to the effect of she is not being monitored for food, when in fact she was. I think those were the internal notes of Dr. Privet which weren't provided to Ms. Waters when she asked for the claim file. And had they been provided, they could have argued directly... Could have responded to that and provided maybe Ms. Green's letter earlier or maybe some documents that may... The other thing I noticed is that those notes which were not provided were actually written. They really appear to be a draft, longer response. They were written to you, meaning the client, and then they weren't sent, and then they weren't provided. So it appears that they contemplated giving a longer explanation and then they didn't. They certainly didn't. And how this might have gone if they had, maybe Altamira had other records it could have provided. We do know that they gave what they had because it went directly to UBH. And I wish they had provided more. I don't know if the outcome would have been different. But the fact is... Let me ask you a question about that. Let's assume that we agree with you that there were a number of procedural violations here, all of which are troubling. All right? Now, I'm a little confused about this conflation of what all that means. Does that mean the fact of the procedural violations themselves, is that in and of itself evidence of the abuse of discretion? Or does that mean that we or the court should be looking at the outcome with abuse of discretion tempered by skepticism and looking to the ultimate conclusion of the I think you know what I'm getting at. There seems to be this conflation and I'm trying to figure out which is the standard to apply if we agree with you there are a lot of procedural violations. I would have to say both. Because first you take all of this and you have to temper or increase the skepticism with which you view what the administrator has done with this information. But then Glenn also says that these procedural violations can also be the tipping point in deciding a case on the merits. And so you take all of this information as well when you're considering the merits and keep it in mind in deciding whether the merits decision is correct or not. The fundamental problem here I think which was mentioned is that on the merits decision the district court looked at the progress that Jennifer made, looked at the fact that this treatment actually helped her and said well you must not have needed it because you got better which is sort of putting the cart before the horse. The proper analysis is look at her when she admitted and her severe impairment in her psychosocial functioning at the time she went into this treatment and the struggles that she had, she clearly needed the treatment. This was the only treatment that helped her. And I'm glad to tell you that she's doing quite well since this treatment with no need for any further residential or inpatient treatment. So if we agree with you with respect to all of this, then you would argue that the appropriate remedy would be remanding this to the administrator? No. The appropriate remedy would be reverse and enter judgment in favor of the plaintiffs. There's no reason to remand to the administrator at this point that all of the facts are in front of the court. You can redo the analysis on the record before you. Because there's an error. That's part of the problem. Do we know that all of the facts are before the court? Was the administrator's foul up not going back to Altamira and saying look, give us some evidence of what actually was done with this lady as opposed to a bunch of stuff about group meetings. Give us some more evidence. And maybe the administrator should have done that. And maybe that's a violation all by itself, not pursuing more information. But if that's the truth, then one doesn't just grant benefits now. One says go back and do it right. Well, at this point, Your Honor, I don't think the administrator gets another bite at the apple, because we did have a trial and we did put some additional Altamira records in at that point, whatever we did have. But the review here is de novo on the choice and application of the standard of review to the facts before the district court. And so the district court's choice and application of the standard of review is what this Court is reviewing right now. And what I'm my position is that the application of that standard of review was error on a de novo basis and it should be reversed. I see my time. Thank you very much. Thank you very much. Counsel. Thank you, Your Honors. Good morning, and may it please the Court, Douglas Cullodell, appearing on behalf of the appellees. I think we start with Judge Smith's question to Ms. Cantor. And what does it all mean if we find that there are some procedural regularities?  process. But the bottom line is that the end result that occurred was that there was a meaningful dialogue between the plan and the plan participant. And the information eventually got to the beneficiary so that she could make her case for getting the benefits in this case. And I think it's important to note, first of all, that the district court did make a finding of fact, which is not clearly erroneous, that the independent medical reviewer had before it all of the relevant evidence. And all the relevant evidence to make the determination in this particular case goes to what was Ms. Lucas suffering at the time that she went into the facility. So if we look at what was ---- Well, doesn't it seem odd that if you really wanted to know the answer to what this person needed, that they didn't talk to somebody in Altamira? I mean, in other ERISA cases, that's what happens. There is some dialogue, I mean, actual dialogue, between the reviewing medical people and the medical people who are responsible for her care. And here there was just this paper review by an anonymous person. Well, Judge Prezan, I think it's important in this case to distinguish the ordinary ERISA case where you have an ongoing treatment and you can have a dialogue with somebody who is in a facility and the reviewer from the plan talks to the treating physician and say, all right, what's going on now? What's happening now? Here it's an after-the-fact review of what happened in the past. Well, look, there were still people who treated her who would have been talking. Well, and Ms. Green was the one who sent the information that was ostensibly documenting Ms. Lucas's position and what she needed at the time. And the key is that at the time, there wasn't a present need for residential treatment, 24-hour care. Who says that? Well, the plan administrator. In review ---- I understand that, but the plan administrator basically says, well, I've looked at the notes and the notes have to do with group meetings. But the letter said, look, we had ---- she needed all this care, 1, 2, 3, 4, 5, 6. And then the plan administrator says, oh, well, but where are the notes that say that? And nobody goes back to them and says, hey, you know, what about the notes that support that she actually got what you said she needed? Well, Judge Fernandez, I think that's not giving the plan credit who ---- because the plan actually sent it out to an independent reviewer who looked at the circumstances. They sent the same stuff. They sent the reviewer ---- all they sent the reviewer was this thing that the reviewer and the administrator think isn't enough, because even though the person from Altamira said she had to have basically 24-7, we had to sit with her after meals, we had to do this, this, this, this and this, that's not enough because the notes don't support it. And nobody went back and said, well, where are the notes about that? True? No, it's not that there was a need for 24-7 treatment. And in the past, you have to remember that UBH and the plan, when Ms. Lucas needed residential treatment, approved it. When ---- but the plan also ---- But it's just very hard to look at this record of a person who was basically kicked out of one residential treatment, sent to the hospital, had then was fired from detoxification places because she was having suicidal problems and so on. And then this is a place of last resort and suddenly she doesn't need the treatment. There's just been no explanation of that. What's ---- the notion seems to have been that she should have been released to the street at that point when she had failed in a whole set of alternative, less restrictive and more restrictive situations. But those occurred in the past, Judge Berzon. And there's also a three-week gap between the last treatment. Right. Because I understand it because they couldn't find a place for her and they finally did. No, she was at a facility for the detoxification. Right. And she was ---- they threw her out, essentially. At a different location. The one that wouldn't let her back was a 24-hour residential treatment center that wouldn't let her back there. But that doesn't mean that you can't find an alternative location. But the bottom line is, is that at the time that she went into Altamira, she didn't need the level of care or there's not evidence that she needed the level of care. Yes, she had issues before. And yes, the plan covered those issues and gave her those benefits. And if you really want to know the answer to that, wouldn't you talk to the people who were treating her, who had treated her? Again, Your Honor, you know, in retrospect, you can look into a lot of things that could have been done better in this case. Also, I must say one piece of this that I find exceedingly odd and troubling is this note that they were not given, which, first of all, seems to be written as if it were meant to be sent to them, but then wasn't. And second of all, has said specifically that she wasn't given her ---- there was no indication that her caloric intake was monitored and so on, or that she required any supervision with meals or bathroom privileges. And that turns out to be flat wrong. But no one ever saw this note until the lawsuit, I gather. Again, Your Honor, there are procedural regulators that occur here. But that's almost inexplicable. I mean, why would they give notes up to January and not after that, if somebody wasn't trying to cover something up? Well, I don't know that it's so nefarious if somebody was trying to cover something up. There were, again, there were glitches along the way. But the bottom line is, at the end of the day, you look to see whether the benefit was properly granted or denied based on ---- Well, that goes to this question that I asked counsel a minute ago about what do we do, what do we do with all this information. Clearly, from these questions, you can tell that there's a strong feeling that there were a lot of procedural violations here on the part of the administrator. So does that mean, in and of itself, is that evidence of abuse of discretion so it's over as abuse of discretion? You seem to be asking us to look past that to the ultimate conclusion and to ask the question of whether the administrator abused its discretion in the determination in the benefit determination and just don't worry too much about these procedural violations. Well, I don't think, I mean, yes, I would like you not to worry about the procedural violations and get down to the, cut to the chase. But realistically, you look at those in the context, each individual procedural violation, and determine, I mean, really how much do you have to look at each one, like the initial denial that was a mistake about statute of limitations type issue. You can analogize to a court looking at section 1983 claim where you have a statute of limitations and you decided on that issue first because you don't have to get to the complex constitutional issue. But if you're shown proof that absolutely the statute of limitations isn't violated, then you get into the next one. And that's what happened at the initial level. This is not a situation like in Harlech where the change in position occurred after the administrative process was over and interfered. All right. But we have accumulation. Let's suppose that we have to answer Judge Smith's question. Right. We have accumulation of problems, which we've pretty much told you what's bothering us. All right. It's not just that one. It's a bunch of them. All right. So what do we do next? Do we say, all right, you abuse your discretion, or do we say, and you lose, or do we say that this is evidence that there was a conflict and so we use it as a tiebreaker on the substance question and the substance question was close enough to us anyway, so you lose, or do we say we're now going to send it back to either the district court or to the administrator to do it all over again right? What do we do next? Well, I think you first look at it in the context of, as Judge Fernandez mentioned earlier, is it a per se rule? And I don't think that is right. It's not a per se rule. If you find that there's some procedural irregularities and that they are cumulative, you get to a point where there is looking at the conflict of interest in the context of those found procedural irregularities. But that doesn't mean you get a planned benefit simply because there may have been irregularities. But suppose we look at all of these and we say, well, this is evidence, pretty good evidence that there was a conflict operating, so we're going to put a thumb on the scale of what we would otherwise do as an abuse of discretion review, and if we thought, well, it doesn't even take that much of a thumb, but with that thumb it was an abuse of discretion, then what do we do? But you still have to look at it in the context of was the planned administrator's decision completely unreasonable, illogical? I'm saying that in the course of doing that, I mean, it's a very strange rule. I understand that it's a strange rule that says that we're applying abuse of discretion review, but with this other factor, this conflict factor fed into it. But if we feed that in, why doesn't that alter the abuse of discretion review enough to tip it over, to break a tie? I don't think that there is a rule, even in the analysis of the abuse of discretion standard, that says if you have a bunch of procedural irregularities, that equates with the granting of a planned benefit automatically. Because you still have to look at it. I didn't say automatically. It would have to be a close case to begin with. But assuming it's a close case to begin with. Doesn't the Hackett case deal with this? And if I understand it, Hackett correctly, it says, you know, if it results in a termination of the benefit, then you return the status quo, restore the benefits. But if it was a denial, then you'd send it back to the administrator and let them figure it out. Well, I think ultimately that would be the way to go here if it's that, you know, confusing or if there's a situation where the plan administrator ought to look at more information. And that, you know, that can be provided. I'm not sure that it could be in this case, you know, given what was afforded at the district court level to try and, from the plaintiff's perspective, color the conflict of interest in this case in her favor. But that would seem to me to be the appropriate rule of law as opposed to this court saying that the decision by the plan administrator was so unreasonable. Because, again, you have to take into account that when you have a plan like this, especially one that goes national, that there are other plan participants that if you automatically or the court here grants a plan benefit based on procedural Can I ask a kind of outside the box question, another different one? Have you guys been through our mediation system? And would it be worth having to sit down with our mediators before we actually submit this case to see if it can be resolved? Your Honor, to me, I think we've, I think there was a mediation conference, a mediation assessment conference. And obviously, you know, we're here today. But sometimes what we do, I mean, you've now heard our, after the argument, it's sometimes useful to just have you have a phone session with the mediators to see whether it is worthwhile at this juncture to get into mediation. Would you object to that? Your Honor, I never object to dialogue and open exchange of information. So we would be amenable to that if the court, you know, would like us to. Do you wish it or you just wouldn't be in contempt of court? Do you wish to have such a session or do you think it would just be wasting time? I'm sorry? Do you wish to have such a session or do you think it would be wasting time as opposed to if we impose it on you, would you object? Well, you can let us know. Okay. You don't need to tell us now. But we can, you know, wait a couple days before we do it. Okay. If the court allows us to fax our response tomorrow even, we can do that. But getting back to the argument and in particular Judge Smith's question, what do we do here if there are procedural irregularities? Again, you need to look at the plan benefits on behalf of all participants as well. And to grant benefits based on strictly on some procedural irregularities along the way would be a detriment to the remainder of the plan's participants. Let me ask you another question, then, while you're searching through your notes. If we agree with you on that and we send it back to the administrator and we say do it right, here's all these procedural violations, the administrator makes a decision and let's say, it doesn't matter what the outcome of that decision is, the disappointed party decides to bring that appeal back up, what's the standard of review at the district court? It's abuse of discretion. Okay. There wouldn't be a new record? I'm sorry? Wouldn't there be a new record? There would be. All right. Would the issue of Amara then have an effect? In other words, does the plot – it's not before us now. In this case, but is it going to come up later, whether the plan itself reserves discretion? Do you follow my question? Not really, Your Honor. I mean, if you're talking about it in terms of a situation where there have been other plans that have a known hostility towards granting benefits, I would have put it in the case. No. What we're talking about is that we have a case on the calendar in a few minutes in which there's an issue as to whether the reservation of abuse of discretion is in the plan description, but it's debatable whether it's in the plan. And under the recent Supreme Court case, it's therefore debatable whether it applies. And here we have a plan description, but we don't have a plan, so we don't know whether the abuse of discretion standard is actually in the plan as opposed to in the plan description. Well, beyond the concession that everybody has made so far in this case. No, we understand it. We know it's abuse of discretion now, but what I'm trying to ask you is if it goes – you might want to think about this in the context of your deciding whether you want to go to mediation or not. You might want to think about this issue. Okay. I see my time is up. Thank you. Thank you very much. Do you want to address the possibility of mediation? What do you think? I'll certainly discuss it with my client. Okay. It would be helpful if each of us, if each of you would write us a letter in the next couple of days. Of course. And all we would be asking you to do, because all we could ask you to do, is to have essentially a conversation about whether to do a mediation, so it would not be forced to mediate, okay? Thank you. To address the issue of what this Court would do with the case, I think it's controlled by the Saloma decision of this Court where the exact same facts happen. Which case? I'm sorry. Saloma, S-A-L-O-M-A-A-642-F3-666, where in this case as well, on the final decision, the Court found that there were new questions asked about additional evidence that the plaintiff might have been able to provide. And in that case, the Court reversed and entered judgment in favor of the plaintiff. And I also wanted to point out that the notes from Altamira are at ER-2164-2251. There are individual therapy notes in there as well as group therapy notes. I understand they're quite difficult to read. And they do not address the supervision of eating and the bathroom privileges, but they do address a number of other issues that demonstrate that these – that the treatment did meet the guidelines for residential treatment. Why wouldn't the thing to do, the outcome be what this Court's decision in Hackett said to do, which I asked in my prior question, if it's a denial of benefits, the status quo to correct the defective procedures is extended back to the plan administrator. If it's a termination of benefits, then to preserve the status quo, you restore the benefits. Was that changed by the Saloma decision? I think that might be a disability case where there's a termination in the middle of them. I don't know if that's a health case. But I think Saloma is controlling. Why does that matter? Hackett. I think Saloma is controlling here where there's been such a violation of the plaintiff's rights. We're not going to – I guess my view is that when we have a complete record here, we've had a trial. I don't know of anything in the ERISA regulations that allows the plan administrator to get to do it again. They've done it wrong over and over and over again. All right. Thank you very much. Thank both of you for your argument. The case of Lucas v. United Behavioral Health is submitted. We're going to delay submission for, let's say, until next Monday until we hear from you about the mediation, just to the degree you're willing to have a phone call with our mediators about whether to go forward. Okay? Your Honor, just for clarification, if we do go to mediation, will you hold the submission at that date? Yes. Yes. Yes. Yes. And it happens, you know, not infrequently that we then hear from the mediators that this isn't going anywhere and we resubmit the case and decide it. Okay? Thank you. All right. We're going to take a 10-minute recess. Thank you. All rise.
judges: Smith, Fernandez, Berzon